Roth *v.* Tucker et al., Appellants.

Argued March 16, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

344

*Lawrence T. Hoyle, Jr.,* Deputy Attorney General, with him *Alexander Kerr,* Deputy Attorney General, and *J. Shane Creamer,* Attorney General, for Commonwealth, appellants.

*Gerald I. Roth,* for appellee.

OPINION PER CURIAM, April 20, 1972:

On March 8, 1972, this Court affirmed the order of the Commonwealth Court in this matter and indicated that an opinion would follow.[1]

This Court is now of the view that the order of the Commonwealth Court should be affirmed on the opinion of the Commonwealth Court. *Roth v. Tucker,* 4 Pa. Commonwealth Ct. 565, 290 A. 2d 98 (1972). We also add the following observation.

------
[1] Mr. Justice EAGEN, Mr. Justice NIX and Mr. Justice MANDERINO dissented from our March 8, 1972, order.

Both Section 915[2] and Section 1002(b)[3] of the Pennsylvania Election Code require that the position of the names of candidates on the ballot be determined by the casting of lots. We believe that these sections require that all candidates for a particular elective post shall have equal chances of drawing any particular ballot position.

Under the scheme proposed by the Secretary of the Commonwealth for determining the ballot positions of candidates for party delegate, each candidate does not have the same chance as all other candidates of drawing any particular ballot position. This inequality arises from the fact that within most electoral districts the number of candidates committed to each particular Presidential candidate or uncommitted is not equal.

For example, in the Eighth Senatorial District there are the following candidates for party delegate:

3 committed to Edmund S. Muskie;

3 committed to George M. McGovern;

1 committed to Henry M. Jackson;

3 committed to Hubert H. Humphrey;

6 uncommitted.

Under the Secretary's proposed plan for determining ballot positions, the chance that a particular candidate for delegate will draw the first position on the ballot is inversely related to the number of candidates for delegate within his particular category—i.e., committed to Muskie, committed to McGovern, uncommitted, etc. In the Eighth Senatorial District the delegate committed to Henry M. Jackson would have one chance in five of drawing the top position on the ballot.[4] How-

---

[2] Act of June 3, 1937, P. L. 1333, art. IX, §915, 25 P.S. §2875.

[3] Id. §1002, 25 P.S. §2962.

[4] Under the Secretary's proposed procedure, lots are first drawn for the position of the categories of candidates for delegate upon the ballot. Since there are five categories in the Eighth Senatorial District, the Jackson category would have one chance in five of

ever, each of the candidates who are uncommitted would only have one chance in thirty of drawing the top ballot position.[5] The remaining candidates for delegate would all have one chance in fifteen to obtain the first ballot position.

In light of the effect that ballot position can have upon an electoral contest, and in light of the Election Code's direction that all candidates shall have equal chances of drawing any particular ballot position, we cannot sanction the procedure proposed by the Secretary.

The order of the Commonwealth Court is affirmed.

Mr. Justice EAGEN dissents.

---

DISSENTING OPINION BY MR. JUSTICE MANDERINO:

I respectfully dissent. The method used for determining the position of names on the primary ballot chosen by the Secretary of the Commonwealth was within her statutory authorization and was designed to aid the voter.

Section 915 of the Election Code (Act of June 3, 1937, P. L. 1333, 25 P.S. §2600 et seq.) authorizes the casting of lots ". . . for the position of *names* upon the primary ballot. . . ." It does not specify what *names*. Since the Election Code *requires both* the name of the delegate candidate *and* the name of the presidential candidate to be on the ballot in the same size type, the Secretary used the only method which could possibly be fair to *both names* which must legally appear on the ballot.

---

obtaining first place among the categories. If the Jackson category did draw first position among the categories, the individual Jackson delegate would, of course, have his name listed first on the ballot.

[5] The uncommitted category would have one chance in five of being selected first among the categories, and each uncommitted candidate for delegate would have a one in six chance of obtaining the top position among the uncommitted candidates for delegate.

The lower court rejected the Secretary's method, saying that it ". . . shifts the focus of the voter's attention on the presidential candidates and away from the delegate candidates. . . ." The observation of the lower court is correct, but that is precisely what the Election Code intended under the recently adopted laws for the selection of presidential delegates. The majority result ignores the names of the presidential candidates which are required to be on the ballot and focuses totally on the names of the delegates. The majority so concludes because it assumes that the names of the local delegates should be the paramount consideration and not the names of the presidential candidates. This assumption has no basis in the Election Code and is completely contrary to the obvious intent of the recently-adopted provisions about presidential candidates and their respective delegates. Act of December 22, 1971, P. L.     , 25 P.S. §2831 et seq.

The new Election Code provisions changed considerably the status of *delegate* in Pennsylvania. Section 809.1 (b) (25 P.S. §2839.1(b)) of the Act of December 22, 1971 requires prior authorization from a presidential candidate before a delegate can commit himself to that particular candidate. Section 809.1(c), 25 P.S. §2839.1(c) provides that nomination petitions for delegates committed to particular presidential candidates ". . . may be obtained only from the presidential candidate or his duly authorized representative . . .", and Section 907, 25 P.S. §2867 provides that nomination petitions for committed delegates must be signed by the particular candidates to whom support is pledged. Section 909, 25 P.S. §2869 makes it mandatory that each sheet of a nomination petition for delegate contain "a notation indicating the presidential candidate to whom the delegate is committed or the term 'uncommitted'." Finally, the Act provides that the

delegates must have indicated on the ballot whether they are committed or uncommitted and that the name of the presidential candidate, or the word "uncommitted", be printed either under or after the name of the delegate in the *same size print*. (See Sections 911, 25 P.S. §2870 and 1110(h), 25 P.S. §2871.) The essence of this Act is to shift the focus from the delegate as an individual and to emphasize instead *the delegate's status* in relation to the presidential candidates. To accomplish this result, the Act is designed so that throughout the entire primary process the delegate and the Secretary of the Commonwealth continually indicate to the electorate that the delegate is committed to a particular presidential candidate or is "uncommitted". Thus, whether the individual delegate is "committed" or "uncommitted" the stress is no longer placed upon the individual delegate but rather upon the delegate's relationship to the presidential candidate. It is clear that in passing this Act the General Assembly recognized the importance of the presidential primary and thus acknowledged that the voters should be given an opportunity to select delegates to national conventions based upon their status in relation to the presidential candidates.

The Secretary's method of first casting lots for the position of the *names* of the presidential candidates and then casting lots for the positions of the individual delegates had the effect of using the lot method for the positioning of *all names* required to be on the ballot. The method mandated by the majority and by the lower court will result in a casting of lots for the delegate names required to be on the ballot but ignores the positioning of presidential candidate names also required to be on the ballot.

The majority concludes that the Secretary acted outside of her statutory authorization. Nowhere in the Election Code is the Secretary told to ignore the

presidential names which must be on the ballot and position only the names of the delegates. It is the method mandated by the majority that is outside the statutory authorization. Any presidential candidate, whose name is required to be on the ballot could legitimately complain under the method mandated by the majority and the lower court that the positioning of his name was not determined by the casting of lots.

The majority attempts to statistically defend the fairness of their method by showing that under the Secretary's method, a delegate committed to Henry M. Jackson would have one chance in five of drawing the top position on the ballot but the uncommitted candidates would have only one chance in thirty of drawing the top ballot position. I assume that the majority without saying so considers the first ballot position as the most desirable and the last ballot position as the least desirable. If this is so, the statistics even out, for the same odds prevail for the last ballot position. The Jackson delegate candidate would have one chance in five of drawing the first position, but he would also have one chance in five of drawing the last position. Likewise, while the uncommitted candidates would have only one chance in thirty of obtaining the first ballot position they would also have only one chance in thirty of obtaining the last ballot position. Thus, while the Jackson delegate may have a better chance to end up in the first position, he also has a better chance of ending up in the last position.

The answer to the question presented to this court is not to be found in statistics. It is to be found in the Election Code. The Secretary acted within her statutory authorization. She used a method that, without question, would be the least confusing to the voters of Pennsylvania. She used the method which recognized the reality of a presidential election in that the

public focuses on the presidential candidate, at least as much, if not more than upon the local delegate. Accordingly, the order of the court below holding the Secretary of the Commonwealth exceeded her statutory authorization should be reversed.

Mr. Justice Nix joins in this dissenting opinion.